AMASA W. HOWLAND and Others, Plaintiffs, *v.* UNION BAG AND PAPER CORPORATION and Another, Defendants.

Supreme Court, Washington County, September 7, 1935.

*E. Arthur Howland* [*Wyman S. Bascom* of counsel], for the plaintiffs.

*John E. Sawyer,* for the defendant Union Bag and Paper Corporation.

*Daniel F. Imrie,* for the defendant Union Bag and Paper Power Corporation.

LAWRENCE, J.  This action is for damages and for an injunction. The action was commenced October 3, 1934.  At the close of the plaintiffs' case the complaint was dismissed as to the defendant Union Bag and Paper Corporation, and was continued against the Union Bag and Paper Power Corporation.

Plaintiffs seek to restrain the defendant power corporation from maintaining a dam at its present height across the Hudson river, known as the Bakers Falls dam at Hudson Falls, N. Y.  Plaintiffs claim ownership of a parcel of land situated on the easterly shore of the Hudson river and some distance above the dam.  The premises were formerly owned by one Henry Lewis.  During the time of his ownership, and about 1868, the Glens Falls Railroad Company, acting under the authority of chapter 140 of the Laws of 1850, condemned a portion of the Lewis property for railroad purposes.

The portion so condemned extended northerly and southerly along the entire length of the Lewis property about 950 feet. Its westerly boundary was the east shore of the Hudson river at low-water mark. The easterly boundary was at distances varying from ten to forty feet east of the railroad tracks. The strip so condemned cut off the remaining portion from the river. The Glens Falls Railroad Company is the predecessor of the Delaware and Hudson Company, which now operates the railroad and which extends from Glens Falls to Fort Edward. The law under which the property was condemned states the title and interest thereby acquired. It provides that the company shall be entitled to enter upon and take possession of and use the lands for the purposes of its incorporation during the continuance of its corporate existence, and further provides that all parties to the condemnation proceedings shall be divested of all right, estate and interest in the real estate during the corporate existence of the railroad company. The order, entered at the termination of the condemnation proceedings in July, 1868, describes the property as extending to low-water mark on the easterly shore of the river. Since that time the lands described have been used for railroad purposes.

The lands located west of the railroad tracks and between those tracks and the easterly shore of the river consist mostly of precipitous banks, rising perhaps thirty feet abruptly from the water's edge and to within a few feet of the railroad tracks in places. This bank at places has been riprapped by the railroad company by depositing large boulders between the railroad tracks and the water's edge, apparently to prevent the banks from caving in. The land on the east side of the tracks is also precipitous in most places and rises about the same distance in height. The plaintiffs are the owners of the upland east of and adjoining the property condemned by the railroad company. The east bounds of their property are at a street line in the village of Hudson Falls upon which is situated a dwelling. They claim to own riparian rights on the river on the opposite side of the tracks and to own the bed of the stream to its center. It is upon this claim of ownership that the issues here in the first instance are to be determined.

Henry Lewis willed all his property to his wife, Sarah Lewis. She died without a will. Three of her heirs at law conveyed the real property to the remaining heir at law. That conveyance describes the property as bounded by the Hudson river on the westerly and northwesterly side. The conveyance was made subject to any rights which had been acquired by the railroad company. The grantee in this deed conveyed the property to Amasa Howland, the grandfather of the present plaintiffs. This

conveyance was made subject to the rights acquired by the railroad company. Plaintiffs derive their title through the will of Amasa Howland by conveyance from the trustees under his will to J. Edward Howland; by him to Fred Howland; by him to his wife, Cora Howland; and by her will to the plaintiffs. These various deeds recognize the rights of the railroad company.

It would seem that the first problem which might well be considered is the effect of these various conveyances and the acquisition by the railroad company of its rights upon the title of the plaintiffs to riparian rights on the easterly shore of the Hudson river, which would otherwise be appurtenant to their upland property. Hudson river at this point is a non-navigable stream. As a general rule grants of land bounded by a stream convey the land under the water to the center of the stream. We are not now considering the effect of the condemnation proceedings. It would, therefore, seem that Amasa Howland acquired the title to the land under the water opposite the property in question to the center of the stream. Defendant contends that plaintiffs have not proven possession of the separate parcels of property lying northerly of the portion on which the dwelling is located, and that they have not proven possession of any land under the water of the Hudson river. These separate parcels were contiguous to the dwelling house portion, and subject to the rights of the railroad company, the bank of the river would be contiguous. It then becomes important to inquire to what extent the rights of the railroad company have modified the riparian rights of the plaintiffs in the river bank and in the bed of the stream. The condemnation proceedings should not be construed as giving to the railroad company any rights in the bed of the stream. Such rights could not be for a corporate purpose. The condemnation proceeding did not attempt to destroy riparian rights although, in effect, it may have suspended their enjoyment. Basic rights remained in the person from whom the rights under the condemnation proceedings were taken and this in my judgment would carry with it riparian rights, subject to the rights acquired by the railroad company. Riparian rights were not mentioned in the condemnation proceedings and could not have been contemplated for any corporate purpose. Rights acquired thereunder must be limited to such as are within the purview of requirements. Defendant contends, however, that the rights acquired by the railroad company were more than an easement and are in the nature of a fee, and that the acquisition of a fee would carry with it all the riparian rights, so that all that would remain would be the " possibility of reverter," which would be the equivalent of a condition subsequent and as such, would not be alienable. From this it is argued that

the only persons who would be entitled to re-enter would be the heirs of Henry Lewis, who would be entitled to enjoy such rights, not by inheritance but as representatives of Henry Lewis. In this connection it must be kept in mind that the rights of the railroad company were not acquired by virtue of any grant from Lewis, and no case has been called to my attention which would construe the rights remaining in Lewis as a condition subsequent. The law invested the railroad company with the right to condemn lands for railroad purposes. It did not invest them with power to acquire an absolute and unlimited fee by condemnation. Some basic title to the land would then remain in the owner, subject, of course, to such rights as were acquired by the railroad company for the reasonable purposes of its existence, protection and convenience. The existence of the railroad between the river and the upland may modify riparian rights but should not be construed to destroy them absolutely. It is assumed that the railroad company could erect any structure for its corporate purposes between its tracks and low-water mark along the entire length of the land bordering on the river, and the plaintiffs would be excluded from interference with such action. If that is possible, then during the corporate existence of the railroad all that would be left to the owner would be the bed of the stream. That was not taken away and would, therefore, remain.

Defendant claims that plaintiffs have no right to maintain this action for the reason that in 1892 Amasa Howland, as part owner of other property, conveyed to the Howland Paper Company, the predecessor of the defendant, in which Amasa Howland was interested, certain lands and water rights on both sides of the river with the dam and flowage rights without reserving to himself, as upstream owner, any right to flow the river appurtenant to his upstream premises, and that by reason of such conveyance, the Howland Paper Company and its successors, including defendant, acquired the right to impound the waters of the river upon the premises of the grantors situated some distance above. I have examined the various deeds to Amasa Howland, the Howland Paper Company, and from them to the Union Bag and Paper Corporation, and discover nothing to substantiate the claim that by such deeds it was intended to convey the bed of the river appurtenant to the premises in question or to impound waters upon or against his upstream property. So far as the court is able to determine from the deeds and evidence before it, it would seem that the property and rights conveyed to Amasa Howland at Bakers Falls and the property now claimed to be owned by the plaintiffs as his successors in title are separated by intervening property and the right, if any,

appurtenant to the upstream property now in question could not be construed to pass to the predecessors of the defendant.

For many years prior to 1914 the Union Bag and Paper Corporation had maintained a dam across the Hudson river at Bakers Falls. This dam at its easterly and central portion was constructed of timbers and on the westerly end was of concrete construction. It varied in height. Some portions of the wooden structure had settled. The concrete portion was at an elevation of 105 feet, according to certain datum. Near the center it was of the height of about 102 feet and the easterly portion was lower, being in places as low as 97 feet according to the same datum. In 1914 the Union Bag and Paper Corporation built a new concrete dam upon the same location as the old dam. This replaced all the old dam except the concrete portion on the west. It was built at an elevation of 104.5 feet according to the same datum. This did not flood any portion of the property claimed by the plaintiffs and they do not claim that the dam maintained at that height interferes in any way with their property or rights. When this dam was constructed sockets were provided in the crest of the dam for the purpose of placing and maintaining flashboards by which to raise the water above the dam. It is the claim of the plaintiffs that the defendant and its predecessor have placed and maintained flashboards on the crest of the dam by means of which the water impounded has been set back upon and against the precipitous banks of the property claimed by them and has converted the bed of the river opposite their land from a flowing stream to still water and has deepened the water upon the bed of the river opposite their property by the height of the flashboards maintained. For this they seek damages and an injunction requiring the defendant to lower the dam to the extent of the flashboards maintained. This new concrete dam was completed December 31, 1914. In the year 1915 or 1916 flashboards were placed at the crest of the dam by the Union Bag and Paper Corporation. These were placed at a height of from thirty inches to thirty-six inches. They were raised higher in later years and at present are about forty-six inches in height. About 3,000 feet upstream from this dam in question is another dam, referred to as the No. 5 dam. Testimony is conflicting regarding the fall of the river from the No. 5 dam to the crest of the concrete dam and the consequent deepening of the water upon the bed of the stream opposite the property claimed by the plaintiffs. I find that the difference in the level of the river between the northerly and southerly lines of the property claimed by plaintiffs is one and fifty-eight one-hundredths feet. Such fall would not make possible any economic development for power

purposes. The bed of the river for storage purposes does have a value and if the defendant has appropriated the right to store water on it, the plaintiffs ordinarily would be entitled to relief. It would then become a question of the extent of such relief, as well as whether plaintiffs had lost the right to it and whether it is suspended under the circumstances in the instant case. It may be stated as a principle of common law that the owner of land bordering on a stream has the right to the flow of the stream in its natural condition past his property. That right may be said to be attached and appurtenant to the ownership of the bank and as an incident of such ownership. The exclusive possession in the railroad company would preclude plaintiffs from erecting any structure upon the bank, and we might well inquire what damages have been sustained by the plaintiffs by reason of an appropriation for water storage. Such damages would seem to be little unless we adopt the theory of their value to the defendant when associated with other rights of the defendant in the instant case, or adopt a theory that such value is to be determined by the damage to the defendant if it should be deprived of storage privileges, or the theory of their value to the defendant as in the case of willful trespass and without considering other elements and entirely eliminating the question of damage to the plaintiffs. I have examined the testimony submitted by the plaintiffs on the question of damages claimed by them. I cannot adopt the result arrived at by the witness Horton. In some respects it is speculative. It is apparent that plaintiffs predicate their right to recover by reason of raising the flashboards. If they should be removed, plaintiffs would have no rights, not even the suspended right of the fall of one and fifty-eight one-hundredths feet in one-half of the river between their property lines. It may be said that they would be entitled to the value of any use to which they might put it. It is difficult to see to what use they could put it under the circumstances in the instant case. It may be argued that exception to the general rule should be made and the basis of damage should be determined by the value of the privilege of storing water. Assuming that such rule might be adopted, the evidence of damage is not reliable or definite, nor is it based on existing conditions. It does not, for example, take into account the right to use the shore line above low-water mark, which is not in the plaintiffs and which would be necessary to effect storage. I have decided to disregard the evidence of the witness Horton. That leaves only nominal damages for the invasion of a right. That invasion, during the corporate existence of the railroad, would apply only to the bed of the stream in which the plaintiffs may be said to have an interest.

Defendant claims that it and its predecessors in title have acquired the right by prescription to maintain flashboards of at least three feet in height. It is true that in 1915 or 1916 flashboards were erected at a height of from thirty to thirty-six inches. In 1932, sections 34 and 35 of the Civil Practice Act, effective September 1, 1932, were amended. This changed the period of limitation in real property actions from twenty years to fifteen years, with the qualification that if a person had been in possession for more than fourteen years and less than nineteen years, rights might be asserted within a year after the statute took effect. This action was commenced October 4, 1934. Under those circumstances prescriptive rights of fifteen years to maintain at least thirty inches of flashboards on the crest of the dam would have been acquired, if this statute has application to the case at bar. This amended period of limitation applies strictly to real property actions. It does not by its language include easements by prescription. The non-statutory period of twenty years for easements by prescription was established by analogy to the period required for adverse possession of real property. The non-statutory requirement has not been changed unless it can be said that the Legislature intended to do so by analogy. In the absence of such inclusion and until such analogy has been definitely established under the amended statute, it would not seem proper to reduce the prescriptive period and destroy what might otherwise be an existing right. I, therefore, hold that the defense of right by prescription has not been established.

Defendant claims that plaintiffs have lost their right to injunctive relief by laches. The present dam was completed December 31, 1914. This action was begun October 3, 1934. The erection of the flashboards upon the crest of the dam followed its construction within two years at least. This may have raised the water opposite the property of the plaintiffs but no appreciable rise was noticed by the plaintiffs until within the last few years. This may have been due to the increased height of the flashboards. It may have been influenced by the regulation of the flow occasioned by the Sacandaga reservoir above. Laches has not been established to the satisfaction of the court.

Defendant contends that large investments have been made and that the public interest and the welfare of many people are involved in the maintenance and operation of the dam as it exists. While this might move the court to deny injunctive relief, the facts here do not show that expenditures were made in reliance upon any supposed right to raise the flashboards. The defendant was chargeable with knowledge of its rights to the same extent as the plaintiffs. When the present defendant acquired the property it

was chargeable with knowledge that plaintiffs' upland property was not included in the conveyance.

It is suggested in a brief that defendant might have been seeking to acquire rights by prescription without compensation after fruitless efforts to agree. It is also suggested that plaintiffs may be making the necessity of defendant their opportunity. It should be stated in this connection that plaintiffs are justified in seeking to secure any existing rights rather than allow them to be lost by lapse of time.

There remains one other question to be considered, which deals with the relief sought. Ordinarily the establishment of a legal right and the invasion of that right would entitle an owner to injunctive relief. That doctrine is recognized in *McCann v. Chasm Power Company* (211 N. Y. 301). There the erection of a dam by defendant flooded upstream owners for a distance of 420 feet, during which distance there was a considerable fall in the river which might be utilized for power purposes. In that case the river banks were precipitous and their ownership and the right of possession was in the plaintiffs. These owners, however, were stockholders in the defendant company and purchased their property after the erection of the dam. They were chargeable with knowledge of the height of the dam and one of them had been instrumental in its construction. The defendant there manufactured electricity and had spent large sums of money in building and equipping its plant and power lines. Plaintiffs had suffered no damage. The trial court awarded nominal damages and granted injunctive relief. The Appellate Division suspended the operation of the injunction and provided that application for it might be renewed or that the plaintiffs might bring an action for any injury that might occur thereafter. The Court of Appeals affirmed the Appellate Division. This case in many respects is similar to the case at bar. Here we have the invasion of a technical right which should be respected. That right, however, could not be utilized because the bank of the river is in the exclusive possession of the railroad company and its possession in plaintiffs would be necessary in order to give the plaintiffs the right to store water. In my judgment the rights of the plaintiffs here are less than in the *McCann* case. The relief announced in that case should control here. The recognition of the plaintiffs' rights here will protect them from their loss by prescription. Equitable relief by way of mandatory injunction may depend upon the circumstances of a particular case and the court should be anxious to inquire whether it is a case of actual and irreparable injury and whether the facts justify equitable interference. While it may seem improper in the same breath to recognize the right to injunctive

relief and deny the right to exercise it, that seems to have been permitted in the *McCann* case and such a disposition of the issues here would seem to be more in harmony with equitable principles. I, therefore, recognize the grounds for injunctive relief but deny the right to exercise it until such time as it is shown that the plaintiffs have sustained more substantial damages.

I have stated my views somewhat at length because of the many issues presented and the importance attached to them by counsel. It may also assist in the preparation of findings.

Findings may be submitted on notice.